## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

EQUITY PLANNING CORPORATION      CASE NO. 1:20-CV-01204

                **Plaintiff,**

    **-vs-**                 **JUDGE PAMELA A. BARKER**

WESTFIELD INSURANCE COMPANY,

                      **MEMORANDUM OF OPINION AND**
             **Defendant.**    **ORDER**

This matter comes before the Court upon the Motion to Dismiss Plaintiff Equity Planning Corporation's Complaint and, alternatively, to Strike the Class Allegations, filed by Defendant Westfield Insurance Company ("Defendant" or "Westfield") on June 3, 2020.  (Doc. No. 5.)  Plaintiff Equity Planning Corporation ("Plaintiff" or "E.P.") filed a Response to Defendant's Motion to Dismiss on October 27, 2020.  (Doc. No. 20.)  Westfield filed a Reply in Support of its Motion on November 10, 2020.  (Doc. No. 21.)  For the following reasons, Westfield's Motion to Dismiss is GRANTED and Westfield's Alternative Motion to Strike the Class Allegations is DENIED as moot.

## I.    Background

### A.    Allegations Set Forth in the Complaint

#### 1.    E.P. alleges losses as result of COVID-19 pandemic

On April 27, 2020, Plaintiff E.P. filed a Class Action Complaint stemming from losses it alleges it suffered as a result of the global COVID-19 pandemic.  (Doc. No. 1-1.)  E.P. is a commercial real estate management and leasing company.  (*Id.* at ¶ 1.)  It leases properties to tenants throughout Ohio and other states.  (*Id.*)  E.P. alleges that it suffered a loss of use of its properties, resulting in a substantial loss of business income when its tenants were forced to shut down their non-essential

businesses during Ohio's Stay At Home Order, thus prohibiting its tenants' ability to pay rent to E.P.. (*Id.* at ¶¶ 24, 26.)

E.P. alleges that at all relevant times, Westfield insured E.P. under an "all-risk" commercial/business owner policy numbered TRA 0-343-47M ("the Policy"). (*Id.* at ¶¶ 7, 14; *see also* Doc. No. 5-3.) According to E.P., the Policy included Business Income and Extra Expense Coverage, which E.P. alleges was meant to provide coverage in the event of business closures by order of Civil Authority. (*Id.* at ¶¶ 9-11.) E.P. alleges that, under the Policy, insurance applies to the "actual loss of business income sustained and the actual, necessary and reasonable extra expenses incurred" when access to E.P.'s property is prohibited by order of Civil Authority as "the direct result of a covered loss to property" in the immediate vicinity of E.P.'s property. (*Id.* at ¶ 11.) According to E.P., "covered physical loss includes, without limitation, **loss of use and/or loss of utilization of the properties**." (*Id.*, emphasis added.) E.P. alleges that under the terms of the Policy, a "physical loss" does not mean and/or require tangible "physical damage" to its property. (*Id.* at ¶ 13.) E.P. alleges that the COVID-19 global pandemic has "physically impacted both public and private property and physical spaces around the world," because COVID-19 can "physically infect[ ] and stay[ ] on surfaces of objects or materials . . . for up to twenty-eight days." (*Id.* at ¶ 17.)

As the seriousness of the COVID-19 global pandemic became clear, health officials across the globe began issuing public health orders in an attempt to halt COVID-19's spread. (*Id.* at ¶¶ 21-23.) On March 23, 2020, the State of Ohio issued its Stay At Home Order, which ordered all Ohioans to stay at home and all non-essential businesses to cease their activities until further notice. (*Id.* at ¶ 26.) E.P. alleges that certain of its tenants were forced to shut down their non-essential businesses during Ohio's Stay At Home Order, thus prohibiting its tenants' ability to pay rent to E.P. (*Id.*) E.P.

alleges that because its tenants were forced to shut down, E.P. suffered "a loss of use of its Properties," and also a "substantial loss of business income."  (*Id.* at ¶ 24.)  Thus, E.P. alleges:

> Coronavirus and the pandemic cause direct physical loss and property damages. COVID-19 and the Pandemic are physically impacting public and private property in Ohio and throughout the country.  The executive orders issued by the Governor of Ohio, and the majority of other State Governors, in response to the pandemic have caused **direct physical loss of** Plaintiff's and Class Members' properties.

(*Id.* at ¶ 27, emphasis added.)

After several of its tenants became unable to pay rent, E.P. made a claim with Westfield under the Policy's business income coverage.  (*Id.* at ¶ 28.)  According to E.P., Westfield acknowledged the claim on March 26, 2020 and assigned it claim number 0002131022.  (*Id.*)  On April 20, 2020, Westfield issued a letter denying coverage to E.P.  (*Id.*)

In its Complaint, E.P. does not allege that COVID-19 was actually found in or on its premises. Instead, E.P. alleges:

> Based on the prevalence of the virus in Cuyahoga County and throughout Ohio, it is probable that Equity sustained direct physical loss of or damage to its properties due to the presence of coronavirus, and has unquestionably sustained direct physical loss as the result of the pandemic and/or civil authority issued by the Governor of Ohio.

(*Id.* at ¶ 29.)  E.P. alleges that a pandemic is a covered loss under the subject Policy and that Westfield based its denial of E.P.'s claim based on "exclusions that are not applicable to a pandemic . . . ."  (*Id.* at ¶ 32.)

E.P. seeks to certify a nationwide Declaratory Relief Class, a nationwide Restitution/Monetary Relief Sub-Class, and an Ohio State Sub-Class for Insurance Bad Faith.  (*Id.* at ¶ 39.)  E.P.'s Complaint sets forth three causes of action: (1) declaratory judgment; (2) breach of contract; and (3) breach of covenant of good faith and fair dealing.  (*Id.* at ¶¶ 52-80.)

3

### 2. Policy TRA 034347M Provisions

The Policy is comprised of several forms and endorsements that are relevant to the instant matter, including the Business Income (and Extra Expense) Coverage Form, the Causes of Loss – Special Form, the Exclusion of Loss Due to Virus or Bacteria endorsement, and the Building and Personal Property Coverage Form. (Doc. No. 5-3.)

The Business Income (and Extra Expense) Coverage Form reads in relevant part as follows:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by **direct physical loss of or damage to** property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a **Covered Cause of Loss**.
> . . .
> Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been **no direct physical loss or damage to** property caused by or resulting from a Covered Cause of Loss.

(*Id.* at PageID# 118, emphasis added.) The Business Income (and Extra Expense) Coverage Form does not define the phrase "direct physical loss of or damage to," as used within the Form. Section "F. Definitions" of the Business Income (and Extra Expense) Coverage Form defines the terms "operations," "period of restoration," and "suspension." (*Id.* at PageID# 126.) Those terms are defined as follows:

> 2. "Operations" means:
>     a. Your business activities occurring at the described premises; and
>     b. The tenantability of the described premises, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.
> 3. "Period of restoration" means the period of time that:
>     a. Begins:
>         (1) 72 hours after the time of direct physical loss or damage for Business Income Coverage; or
>         (2) Immediately after the time of direct physical loss or damage for Extra Expense Coverage;

4

caused by or resulting from any Covered Cause of Loss at the described premises; and

b. Ends on the earlier of:

(1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

(2) The date when business is resumed at a new permanent location.

"Period of restoration" does not include any increased period required due to the enforcement of or compliance with any ordinance or law that:

(1) Regulates the construction, use or repair, or requires the tearing down of any property; or

(2) Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration date of this policy will not cut short the "period of restoration."

. . .

6. "Suspension" means:

a. The slowdown or cessation of your business activities; or

b. That a part of all of the described premises is rendered untenantable, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

(*Id.* at PageID# 126.)

The relevant Civil Authority coverage provisions are also set forth in the Business Income (and Extra Expense) Coverage Form, to wit:

**5. Additional Coverages**
   **a. Civil Authority**
   In this Additional Coverage, Civil Authority, the described premises are premises to which this Coverage Form applies, as shown in the Declarations.

   When a **Covered Cause of Loss causes damage to property** other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

   (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

5

> (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

(*Id.* at PageID# 119, emphasis added.)

The Causes of Loss – Special Form defines the term "Covered Causes of Loss" as follows:

> **A. Covered Causes Of Loss**
>
> When Special is shown in the Declarations, **Covered Causes of Loss means direct physical loss** unless the loss is excluded or limited in this policy.

(*Id.* at PageID# 165, emphasis added.)  The Causes of Loss – Special Form also sets forth certain exclusions with respect to Covered Causes of Loss that read in relevant part as follows:

> **B.** Exclusions
> **...**
> > **2.** We will not pay for loss or damage caused by or resulting from any of the following:
> > . . .
> > > **b.** Delay, loss of use or loss of market.

(*Id.* at PageID# 165, 167.)  The Causes of Loss – Special Form does not define the phrase "direct physical loss" as used in the Form.

The Policy also contains an endorsement titled Exclusion of Loss Due to Virus or Bacteria.

(*Id.* at PageID# 130.)  The endorsement modifies insurance provided under the Commercial Property Coverage Part and the Standard Property Policy.  (*Id.*)  The Exclusion of Loss Due to Virus or Bacteria endorsement reads in relevant part as follows:

> **A.** The exclusion set forth in Paragraph B. applies to all coverage under all forms and endorsements that comprise this Coverage Part or Policy, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

6

**B.** We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

However, this exclusion does not apply to loss or damage caused by or resulting from "fungus", wet rot or dry rot. Such loss or damage is addressed in a separate exclusion in this Coverage Part or Policy.

(*Id.*)

The Building and Personal Property Coverage Form reads in relevant part as follows:

> **A. Coverage**
> We will pay for **direct physical loss of or damage to** Covered Property at the premises described in the Declarations caused by or resulting from any **Covered Cause of Loss.**
> . . .
> **3. Covered Causes of Loss**
> See applicable Causes Of Loss form as shown in the Declarations.

(*Id.* at PageID# 176, 178, emphasis added.)  The Building and Personal Property Coverage Form does not set forth a definition of the phrase "direct physical loss of or damage to."

## B.    Procedural History

On April 27, 2020, E.P. filed its Complaint in the Court of Common Pleas of Cuyahoga County, Ohio against Westfield.  (Doc. No. 1-1.)  On June 1, 2020, Defendant removed this action to this Court, pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).  (Doc. No. 1.) On June 3, 2020, Defendant filed the instant Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6), or in the alternative, to strike the Class allegations.  (Doc. No. 5-1.)  E.P. moved to remand the matter back to the Court of Common Pleas of Cuyahoga County, Ohio.  (Doc. No. 8.)  The Court denied E.P.'s Motion to Remand on October 6, 2020.  (Doc. No. 18.)  Subsequently, E.P. filed a Response to Westfield's Motion to Dismiss on October 27, 2020.  (Doc. No. 20.)  Westfield filed a Reply in

7

Support of its Motion to Dismiss on November 10, 2020.  (Doc. No. 21.)  Thus, Westfield's Motion

to Dismiss became ripe for a decision on November 10, 2020.

Both parties filed several Supplemental Authorities in Support of their respective positions.

Westfield filed six Supplemental Authorities in Support of its Motion to Dismiss on: October 16,

2020, December 8, 2020, December 22, 2020, February 3, 2021, February 12, 2021, and February

19, 2021.  (Doc. Nos. 19, 22, 23, 28, 29, 32.)  E.P. filed five Supplemental Authorities on: December

30, 2020, January 21, 2021, February 3, 2021, February 12, 2021, and February 17, 2021.  (Doc. Nos.

24, 25, 27, 30, 31.)  Westfield filed a Response to E.P.'s January 21, 2021 Supplemental Authority

on January 25, 2021.  (Doc. No. 26.)

## II.     Westfield's Motion to Dismiss E.P.'s Complaint

### A.     Legal Standard

Westfield moves to dismiss E.P.'s Complaint for failure to state a claim under Fed. R. Civ. P.

12(b)(6).  Under Fed. R. Civ. P. 12(b)(6), the Court accepts the plaintiff's factual allegations as true

and construes the Complaint in the light most favorable to the plaintiff.  *See Gunasekara v. Irwin*,

551 F.3d 461, 466 (6th Cir. 2009).  In order to survive a motion to dismiss under this Rule, "a

complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a

formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief

above a speculative level.'"  *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir.

2009) (quoting in part *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S.Ct. 1955, 167

L.Ed.2d 929 (2007)).

The measure of a Rule 12(b)(6) challenge—whether the Complaint raises a right to relief

above the speculative level—"does not 'require heightened fact pleading of specifics, but only enough

facts to state a claim to relief that is plausible on its face.'" *Bassett v. National Collegiate Athletic Ass'n.*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting in part *Twombly*, 550 U.S. at 555-56, 127 S.Ct. 1955). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Deciding whether a complaint states a claim for relief that is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Consequently, examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that 'Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Gunasekera*, 551 F.3d at 466 (quoting in part *Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007)) (quoting *Twombly,* 127 S.Ct. at 1964). Nonetheless, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937.

### B. Analysis

Westfield argues that E.P.'s Complaint should be dismissed for four overarching reasons: (1) a "loss of use or loss of market", as alleged by E.P. is excluded from the definition of what constitutes a Covered Cause of Loss capable of giving rise to Business Income and Extra Expense coverage; (2) because E.P. fails to allege that the suspected or actual presence of coronavirus at its properties resulted in a tangible structural alteration to the affected properties it does not constitute "direct

physical loss of or damage to" its properties under Ohio law; (3) E.P.'s Civil Authority coverage claim fails because Ohio's Stay At Home Order was issued to prevent the spread of COVID-19, not to remediate existing damage at a property adjacent to E.P.'s; and (4) E.P.'s Policy contains an unambiguous Virus Exclusion that bars coverage for loss or damage resulting from any virus capable of inducing disease or illness.  (Doc. No. 5-1, PageID# 60.)

In its Response to Westfield's Motion to Dismiss, E.P. argues that the Virus Exclusion does not bar coverage because it is ambiguous and does not contain an anti-concurrent causation clause; Westfield's definition of "direct physical loss of or damage to" covered property is overly narrow; E.P. properly pleaded direct physical loss or damage to its covered property "due to the probable presence" of COVID-19 particles; and that the Covered Cause of Loss exclusion for "loss of use or loss of market" does not exclude coverage here.  (Doc. No. 20.)

### 1.    Interpretation of Insurance Contracts Under Ohio Law

The parties agree that Ohio law applies.  (*See* Doc. No. 5-1, PageID# 66; Doc. No. 20, PageID# 463.)  The Court will briefly address the general principles governing the interpretation of insurance contracts under Ohio law.  These principles will inform the Court's subsequent analysis of the parties' arguments.  Under Ohio law, "[a]n insurance policy is a contract whose interpretation is a matter of law." *Sharonville v. Am. Employers Ins. Co.*, 846 N.E.2d 833, 836 (Ohio 2006) (*citing Alexander v. Buckeye Pipe Line Co*., 374 N.E.2d 146, 150 (Ohio 1978)).  A court "examine[s] the insurance contract as a whole and presume[s] that the intent of the parties is reflected in the language used in the policy." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003).

The absence of definitions does not necessarily make terms ambiguous.  *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 652 N.E.2d 684, 686 (Ohio 1995); *see also Penton Media, Inc.*

*v. Affiliated Fm Ins. Co.*, No. 1:03-cv-2111, 2005 WL 8171363, at *6 (N.D. Ohio Sept. 30, 2005) (citing *Chicago Title Ins. Co. v. Huntington Nat'l Bank*, 719 N.E.2d 955, 959 (Ohio 1999)) ("Simply because a term in a contract is not defined does not mean that the policy is ambiguous."). "'If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined.'" *Guman*, 652 N.E.2d 684 at 686 (quoting *Inland Refuse Transfer Co. v. Browning-Ferris Inds. of Ohio, Inc.* 474 N.E.2d 271, 272 (Ohio 1984)). Thus, a court must "look to the plain and ordinary meaning of the language used in the policy unless another meaning is clearly apparent from the contents of the policy." *Westfield Ins. Co.*, 797 N.E.2d at 1261. "When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties. . . . As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Id.*

Moreover, "a contract term is not ambiguous simply because parties disagree about its meaning." *Tattletale Portable Alarm Sys., Inc. v. MAF Prods., Inc.*, No. 2:14-cv-00574, 2016 WL 5122545, at *6 (S.D. Ohio Sept. 21, 2016) (citing *Shifrin v. Forest City Enters.*, 597 N.E.2d 499, 501 (Ohio 1992)).

On the other hand, if a contract is ambiguous, "a court may consider extrinsic evidence to ascertain the parties' intent." *Id.* A court may not "alter a lawful contract by imputing an intent contrary to that expressed by the parties." *Id.* at 1261-62. In the insurance context, "[i]f provisions are susceptible of more than one interpretation, they 'will be construed strictly against the insurer and liberally in favor of the insured.'" *Sharonville*, 846 N.E.2d at 836 (quoting *King v. Nationwide Ins. Co.*, 519 N.E.2d 1380, syllabus (Ohio 1988)). "Additionally, 'an exclusion in an insurance policy

11

will be interpreted as applying only to that which is *clearly* intended to be excluded.'"  *Id.* (quoting *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.* 597 N.E.2d 1096, 1102 (Ohio 1992)).

This rule has limitations.  While an insurance policy that is "reasonably open to different interpretations will be construed most favorably for the insured, that rule will not be applied so as to provide an unreasonable interpretation of the words of the policy."  *Westfield Ins. Co.*, 797 N.E.2d at 1261 (quoting *Morfoot v. Stake*, 190 N.E.2d 573, syllabus (Ohio 1963)).

Further, in construing a contract, a court must read and consider the provisions as a whole and not in isolation.  *Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth.*, 678 N.E.2d 519, 527 (Ohio 1997).  "Courts should not interpret contracts in a way that 'render[s] at least one clause superfluous or meaningless.'"  *Transtar Elec., Inc. v. A.E.M. Elec. Servs. Corp.*, 16 N.E.3d 645, 651-52 (Ohio 2014) (quoting *Sloan & Co. v. Liberty Mut. Ins. Co.*, 653 F.3d 175, 181 (3rd Cir. 2011)).

### 2.  Business Income and Extra Expense Coverage

The Court will first determine whether E.P. alleges a loss that triggers coverage under the Policy language.  This case, like many other COVID-19 coverage cases, turns on whether E.P. can show "direct physical loss of or damage to" its insured property.  The parties dispute the meaning of this phrase.

Westfield argues that E.P. cannot establish that its suspension of its operations was caused by a "direct physical loss of or damage to" its property because E.P. only speculates as to whether COVID-19 was ever present at any of its properties.  (Doc. No. 5-1, PageID# 67.)  According to Westfield, nothing in the Policy or law suggests that closing a property due to the suspected or potential presence of a substance or condition qualifies as a "direct physical loss or damage."  (*Id.*)

12

Westfield argues that E.P.'s loss is based on the forced closure of its premises and the adverse business consequences that resulted. (*Id.*) This, according to Westfield, is not a "direct physical loss or damage" that could give rise to Business Income and Extra Expense coverage. (*Id.*) Moreover, according to Westfield, even if E.P. could allege that COVID-19 was present at one or more of its properties, that condition still does not constitute "direct physical loss or damage" under Ohio law. (*Id.* at PageID# 67-68.) Westfield contends that Ohio law defines "physical loss" or "physical damage" to mean a harm that adversely affects the structural integrity of a property. (*Id.* at PageID# 68, citing *Mastellone v. Lightning Rod Mut. Ins. Co.*, 175 Ohio App. 3d 23, 40-42 (Ohio 8th Dist. Ct. App. 2008).) Westfield argues that E.P.'s theory that it suffered a physical loss because E.P. was temporarily unable to make full use of the property fails because E.P. does not allege harm that adversely affected the structural integrity of its property, as required under Ohio law. (*Id.*)

In response, E.P. makes several arguments as to why the phrase "direct physical loss of or damage to" can be reasonably interpreted in multiple ways and that, as a result, the Court must construe the Policy in a way that results in coverage for the insured. (Doc. No. 20, PageID# 467, 468-476.) E.P. first argues that Westfield conflates the meanings of "loss of" or "damage to." (Doc. No. 20, PageID# 468.) E.P. contends that these phrases are stated in the disjunctive because they are separated by "or" as separate triggers of coverage, i.e., for "loss of" property, *or* "damage to" property. (*Id.* at PageID# 469.) Because "loss" can be reasonably defined as "material deprivation," E.P. argues that it is reasonable to define a "physical loss of" property as contemplating a situation in which "insured businesses are physically deprived of their business property because a physical substance had a physical impact on the property that rendered the property deficient or lacking in some quality rendering it unfit for its intended use." (*Id.*, emphasis removed.) E.P. also argues that

13

"physical loss" and "physical damage" must mean something different, or else one or the other would be rendered surplusage. (*Id.* at PageID# 470.)

E.P. further argues that one reasonable interpretation of the term "physical loss of or damage to" property is **loss of use** of property. (*Id.*) According to E.P., the term "property damage" can encompass loss of use of property. (*Id.* at PageID# 470-71.) Additionally, E.P. argues that several cases from around the country support its position that "direct physical loss of or damage to property" does not necessarily require tangible, structural harm to the insured premises. (*Id.* at PageID# 471-73.) Finally, E.P. disagrees that Ohio law interprets "direct physical loss" to require structural harm to insured premises. (*Id.* at PageID# 474-75.)

In its Reply, Westfield argues that the overwhelming majority of courts to consider the issue have concluded that COVID-19-related losses of income due to business closures and suspended operations do not constitute "direct physical loss." (Doc. No. 21, PageID# 493.) Because E.P. "seeks coverage for a purely economic loss" and does not allege that it suffered any tangible, demonstrable harm, it does not plausibly allege "direct physical loss of or damage to" its property. (*Id.* at PageID# 494-96.) Additionally, Westfield disagrees that its interpretation of "direct physical loss of or damage to" renders one or the other surplusage. (*Id.* at PageID# 496-97.) To the contrary, Westfield argues, E.P.'s interpretation of "direct physical loss of or damage to" renders several other Policy provisions surplusage. (*Id.*) Westfield argues that E.P.'s interpretation that "direct physical loss of or damage to" includes loss of use dispenses with the modifiers "direct" and "physical" altogether. (*Id.* at PageID# 498.) Westfield also argues that E.P.'s definition of "direct physical loss" requires courts to ignore the "period of restoration" language in the Business Income (and Extra Expense) Coverage Form, which contemplates "correction of a tangible condition rather than mere economic harm from

14

loss of use."  (*Id.*)  If loss of use was included in "direct physical loss," there would be nothing to repair, rebuild, or replace, as set forth in the period of restoration language.  (*Id.*)

The Court finds that E.P. fails to plausibly allege a threshold claim of "direct physical loss of or damage to" its insured premises, and therefore, E.P.'s claim for Business Income and Extra Expense coverage fails.  The Court begins its analysis by examining the plain language of the Business Income (and Extra Expense) Coverage Form.  (Doc. No. 5-3, PageID# 118.)  The Form specifies that Westfield

> will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration".  The "suspension" must be caused by **direct physical loss of or damage to** property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a **Covered Cause of Loss**.

(*Id.*, emphasis added.)  The form does not define "direct physical loss of or damage to" insured property.  However, "[s]imply because a term in a contract is not defined does not mean that the policy is ambiguous."  *Penton Media, Inc.*, 2005 WL 8171363, at *6.  When an insurance contract does not define a term, the Court looks to "the plain and ordinary meaning of the language used in the policy unless another meaning is clearly apparent from the contents of the policy."  *Westfield Ins. Co.*, 797 N.E.2d at 1261.

   a) **Plain and Ordinary Meaning of "Direct Physical Loss of or Damage to"**

First, the Court starts with the plain language "direct," "physical," "loss," and "damage."  "Direct" is defined as "stemming immediately from a source."  *Direct, Merriam-Webster*, https://www.merriam-webster.com/dictionary/direct (last visited Feb. 22, 2021).  "Physical" is defined as "having material existence: perceptible especially through the senses and subject to the

15

laws of nature." *Physical*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/physical (last visited Feb. 22, 2021). "Loss" is defined as "destruction, ruin" and also as "the act of losing possession: deprivation." *Loss*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/loss (last visited Feb. 22, 2021). Finally, "damage" is defined as "loss or harm resulting from injury to person, property, or reputation." *Damage*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/damage (last visited Feb. 22, 2021).

> Recently, another court in this District analyzed identical language and concluded as follows:
>
> Taking these words together according to their ordinary meanings, "physical loss of" property means material, perceptible destruction or deprivation of possession. "Physical damage to" property means material, perceptible harm. In other words, the phrase intends a tangible loss of or harm to the insured property, in whole or in part. As the trigger for coverage, this policy language excludes financial or monetary losses resulting from the novel coronavirus, SARS-CoV-2, which occasioned this dispute for the simple reason that the virus did not work any perceptible harm to the properties at issue, even if (construing the allegations in Plaintiffs' favor) the virus may be found on surfaces there.

*MIKMAR*, *Inc., et al. v. Westfield Ins. Co.*, No. 1:20-cv-1313, 2021 WL 615304, at *6 (N.D. Ohio Feb. 17, 2021); *see also Brunswick Panini's, LLC, et al. v. Zurich Am. Ins. Co.*, No. 1:20-cv-1895, 2021 WL 663675, at *7-8 (N.D. Ohio Feb. 19, 2021) (concluding that, under the same "direct physical loss of or damage to" policy language, insureds' "claim for loss of full use of their premises and for business interruption" was precluded).

The Court agrees with *MIKMAR*'s analysis and conclusion. The Court must give effect to *all* terms in the context of the Policy language. "Loss" is modified by the terms "direct" *and* "physical." When "direct," "physical," and "loss" are read together with their ordinary meanings, the Court concludes that the Business Income (and Extra Expense) Coverage Form unambiguously covers an immediate material, perceptible harm that leads either to complete destruction or deprivation ("direct

physical loss") or partial destruction ("direct physical damage").  *See also Santo's Italian Café LLC v. Acuity Ins. Co.*, --- F.Supp.3d ---, 2020 WL 7490095, at *12 (N.D. Ohio Dec. 21, 2020); *see also Brunswick Panini's, LLC, et al. v. Zurich Am. Ins. Co.*, No. 1:20-cv-1895, 2021 WL 663675, at *7-8 (N.D. Ohio Feb. 19, 2021).

E.P.'s interpretation that "direct physical loss" includes economic losses, such as those that E.P. claims here, stretches the Policy language beyond its plain meaning and requires the Court to read the word "physical" out of the Policy language.  (Doc. No. 20, PageID# 471.)  The Court may not do so.  Additionally, the Policy does not protect against the "physical loss of **use** or damage to property," and the Court also may not read words *into* the Policy language.

Further, E.P. argues that "physical loss" and "physical damage" must be interpreted to mean different things so as not to render one or the other superfluous.  (*Id.* at PageID# 469-70.)  E.P. argues that "loss" may be reasonably defined to afford coverage where the insured was "'materially deprived' of property for a period of time."  (*Id.* at PageID# 469.)  E.P. cites two Ohio cases to support its argument that the definition of "loss" includes deprivation: *Polk v. Landings of Walden Condo. Ass'n.* and *Downwyn Farms v. Ohio Ins. Guar. Ass'n.*  (Doc. No. 20, PageID# 469-70.)  Neither decision helps advance E.P.'s argument that its economic losses were the result of a "material deprivation" of its insured property.

In *Polk*, the Ohio Court of Appeals considered the following policy language: "[n]o action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of **loss**."  *Polk v. Landings of Walden Condo. Assoc.*, 2005 WL 1862126, at *7 (Ohio 11th Dist. Ct. App. 2005) (emphasis added).  The court observed that the policy did not define the term "loss," but that Gilbert's Law Dictionary defined "loss" as "[i]njury; forfeiture;

17

deprivation; damage; deficiency."  *Id.*  The language at issue in *Polk* is clearly distinguishable from the instant Business Income (and Extra Expense) Coverage Form language because in *Polk*, the word "loss" is not surrounded by any modifiers, such as "direct" and/or "physical."  While "loss" can be defined as a "deprivation," the instant Business Income (and Extra Expense) Coverage Form requires that the loss be "direct" and "physical."  E.P. has not alleged that it was physically deprived of its business property in any way.  E.P. possessed—and still possesses—its physical property.

E.P.'s citation to *Downwyn Farms v. Ohio Ins. Guar. Ass'n.* is also unpersuasive.  In *Downwyn*, the Ohio Court of Appeals concluded that a horse breeder was "materially deprived" of his colt when the farm responsible for the care of the breeder's mare lost the colt after its birth. *Downwyn Farms v. Ohio Ins. Guar. Ass'n.*, No. 89CA004593, 1990 WL 7991, at *3 (Ohio 9th Dist. Ct. App. Jan. 30, 1990).  The breeder's colt was mistakenly sent "home" to the wrong farm, rather than to the breeder's farm, and could not be located for more than a year.  *Id.* at *2.  The *Downwyn* policy provided coverage for "physical loss or injury or damages causing death," but did not define "physical loss."  *Id.* at *3-4.  The court concluded that "physical loss" could be defined as "material deprivation" and, therefore, the policy covered the misplacement of the colt.  *Id.* at *4.  Here, E.P. does not allege that its property went missing, was stolen, or that it was physically deprived of its property in some other way.  Unlike the breeder in *Downwyn*, E.P. did not lose possession of its property or completely lose the ability to use its property.  Instead, E.P. alleges that it was deprived "from making *full use* of the Property."  (Doc. No. 1-1, ¶ 12, emphasis added.)  *Downwyn* does not support E.P.'s interpretation of "material deprivation" as applied to E.P.'s purely economic losses because E.P. never lost possession of its property.  *Downwyn Farms*, 1990 WL 7991, at *3-4.

The Court agrees with E.P. that the terms "direct physical loss of" and "direct physical damage to" mean different things.  As the Court concluded above, "direct physical loss" means that there was complete tangible, material destruction or deprivation of insured property while "direct physical damage" means that there was partial tangible, material destruction of insured property.   However, the Court disagrees with E.P.'s contention that its economic losses must be covered under the Policy because it was deprived of using its property to the fullest extent for a time.  (Doc. No. 20, PageID# 469.)  E.P. cites to two other cases to support its argument that a "material deprivation" is a "direct physical loss," but these cases do not interpret Ohio law and, at any rate, involved *permanent* deprivations of property.  *See Nautilus Group, Inc. v. Allianz Glob. Risks US*, No. C11-5281BHS2012, WL 760940, at *7 (W.D. Wash. Mar. 8, 2012) (denying insurer's motion for judgment on the pleadings because a reasonable person would understand the at-issue insurance policy to "cover theft of personal property as 'physical loss'"); *Total Intermodal Servs., Inc. v. Travelers Prop. Cas. Co. of America*, No. CV 17-04908 AB (KSx), 2018 WL 3829767, at *4 (C.D. Cal. July 11, 2018) (denying insurer's motion for summary judgment because the phrase "loss of" includes the "*permanent* dispossession of something," which is what happened to the insured's cargo when it fell into possession of foreign customs authorities (emphasis added)).  E.P. does not allege that it was permanently deprived of its property in any way.

Other Policy language further bolsters the conclusion that the Business Income (and Extra Expense) Coverage Form's threshold requirement of "direct physical loss of or damage to" insured property contemplates some sort of tangible, structural alteration to the property.  For example, the Business Income (and Extra Expense) Coverage Form's "period of restoration" contemplates physical repairs to insured premises following a Covered Cause of Loss.  (Doc. No. 5-3, PageID#

118.)  According to the Business Income (and Extra Expense) Coverage Form, the "period of restoration" begins "72 hours after the time of direct physical loss or damage for Business Income Coverage," or "[i]mmediately after the time of direct physical loss or damage for Extra Expense Coverage" caused by or resulting from any Covered Cause of Loss at the insured premises, and ends either on the earlier of "[t]he date when the property at the described premises should be **repaired, rebuilt or replaced**," or "the date when business is resumed at a new permanent location."  (*Id.* at PageID# 126, emphasis added.)  The Court agrees with Westfield that construing "direct physical loss" or "direct physical damage" to cover intangible losses, such as the economic losses that E.P. seeks to have Westfield cover, renders large parts of the "period of restoration" definition nonsensical because intangible losses cannot be repaired, rebuilt, or replaced.  The "period of restoration" definition contemplates a definite length of time set aside for physical repairs to physical loss or damage.  (*See* Doc. No. 5-3, PageID# 126.)

Additionally, the Covered Causes of Loss – Special Form excludes "loss or damage caused by or resulting from . . . delay, **loss of use** or loss of market."  (Doc. No. 5-3, PageID# 167, emphasis added.)  This exclusion further suggests that the Policy requires more than a loss of use or other intangible harm to trigger coverage.  *See also MIKMAR*, *Inc.,* 2021 WL 615304, at *5 (concluding same); *Brunswick Panini's*, 2021 WL 663675, at *9 (concluding same); *Ceres Enters., LLC v. Travelers Ins. Co.*, No. 1:20-cv-1925, 2021 WL 634982, at *5 (N.D. Ohio Feb. 18, 2021) (concluding same).

### b)      Ohio Case Law

In addition to the plain, ordinary meaning of the Policy language, existing Ohio case law provides persuasive authority to further bolster the conclusion that "physical loss" and "physical

damage" do not include loss of use. Ohio law applies to the instant dispute, but the Ohio Supreme

Court has not interpreted the meaning of "physical loss of or damage to" insured property. *See*

*MIKMAR, Inc.*, 2021 WL 615304, at *9; *Brunswick Panini's*, 2021 WL 663675, *7. If the Ohio

Supreme Court has not spoken on an issue, then the district court turns to the decisions of Ohio's

lower courts, to the extent they are persuasive, to predict how the Ohio Supreme Court would decide

the issue.[1] *Kepley v. Lanz*, 715 F.3d 969, 972 (6th Cir. 2013); *Bailey v. V & O Press Co.*, 770 F.2d

601, 604 (6th Cir. 1985). In *Bailey*, the Sixth Circuit, observing that the Ohio Supreme Court had

not addressed the issue *sub judice*, delineated several sources of relevant data that a federal court may

consider when determining how the state supreme court would rule on an issue:

> The sources of data which may guide our inquiry include the decisional law of the
> Ohio Supreme Court in analogous cases and relevant dicta in related cases, *McKenna
> v. Ortho Pharmaceutical Co.*, 622 F.2d 657, 662-63 (3d Cir. 1980), cert. denied, 449
> U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980); C. Wright, A. Miller & E. Cooper,
> Federal Practice and Procedure, § 4507 (2d ed. 1982). The decisional law of Ohio
> appellate courts, *Waltzer v. Transidyne General Corp.*, 697 F.2d 130 (6th Cir. 1983);
> *Tomlinson v. McCutcheon*, 554 F.Supp. 186, 188 (N.D.Ohio 1982); and Ohio trial
> courts, *Bradley v. General Motors Corp.*, 512 F.2d 602, 605 (6th Cir.1975); *Wolf v.
> Gardner*, 386 F.2d 295, 297 (6th Cir. 1967) (common pleas decisions have weight to
> extent reasoning and conclusions persuasive), are accorded weight, although a federal
> court is not bound by lower court determinations if convinced by other data that the
> state's highest court would determine otherwise. *See Commissioner v. Estate of Bosch*,
> 387 U.S. 456, 462–66, 87 S.Ct. 1776, 1781-83, 18 L.Ed.2d 886 (1967); *Woodruff v.
> Tomlin*, 616 F.2d 924, 929 (6th Cir. 1980), cert. denied, 449 U.S. 888, 101 S.Ct. 246,
> 66 L.Ed.2d 114 (1980). In addition, consideration may be given to positions expressed
> in restatement of law, *Garrison v. Jervis B. Webb Co.*, 583 F.2d 258, 262 n.6 (6th Cir.
> 1978), law review commentaries, *McKenna*, 622 F.2d at 662-63, and decisions from
> other jurisdictions or the "majority" rule. C. Wright, A. Miller & E. Cooper, *supra*, §
> 4507.

---

[1] On January 19, 2021, another court in this District certified a question like the dispositive one in this case to the Ohio
Supreme Court for review. *See Neuro-Communication Servs., Inc. v. Cincinnati Ins. Co.*, No. 4:20-cv-01275, 2021 WL
274318, at *1 ("Does the general presence in the community, or on surfaces at a premises, of the novel coronavirus known
as SARS-CoV-2, constitute direct physical loss or damage to property; or does the presence on a premises of a person
infected with COVID-19 constitute direct physical loss or damage to property at that premises?"). However, as of the
date of the Court's filing of this Order, the Ohio Supreme Court has not yet ruled on this question.

*Bailey*, 770 F.2d at 604.  In interpreting the phrase "direct physical loss of or damage to," the Court is obliged to give the undefined terms their ordinary or common meaning, *see supra*, and to follow the guidance in decisions of the Ohio courts.  Both parties, in their initial briefing and supplemental authorities, cite dozens of cases from jurisdictions outside of Ohio to support their respective arguments.  However, the parties cannot point to—and the Court has not found—an Ohio Supreme Court decision addressing the issue at hand.  In the absence of Ohio Supreme Court authority, this Court may turn to lower court decisions as predictors of how the Ohio Supreme Court would rule on this issue.  *See Bailey*, 770 F.2d at 604.

As this Court observed in *Santo's Italian Café LLC v. Acuity Ins. Co.*, and as other courts in this District observed in *MIKMAR*, *Brunswick Panini's*, and *Ceres Enters., LLC v. Travelers Ins. Co.*, the Ohio Court of Appeals' decision in *Mastellone v. Lightning Rod Mut. Ins. Co.* supports the contention that Ohio courts construe a similar term, "direct physical injury," to mean that the insured's property has suffered some sort of tangible, actual harm, not intangible or ephemeral effects. *See Santo's Italian Café LLC*, 2020 WL 7490095, at *8; *MIKMAR*, *Inc.,* 2021 WL 615304, at *6; *Brunswick Panini's*, 2021 WL 663675, at *7-8; *Ceres Enters., LLC v. Travelers Ins. Co.*, No. 1:20-cv-1925, 2021 WL 634982, at *7 (N.D. Ohio Feb. 18, 2021).

In *Mastellone*, the Ohio Court of Appeals addressed the plain and ordinary meaning of a similar term, "physical injury."  *Mastellone v. Lightning Rod Mut. Ins. Co.*, 175 Ohio App. 3d 23, 40 (Ohio 8th Dist. Ct. App. 2008).  The *Mastellone* court concluded that the presence of staining mold on the exterior of the insureds' house "did not rise to the level of 'physical injury' to the siding, because it was only temporary and did not affect the structure of the wood."  *Id.* at 41.  The court observed that when the term "loss" is used in an insurance policy, it is "given its ordinary meaning

22

of 'injury; forfeiture; deprivation; damage; deficiency.'" *Id.* at 38 (quoting *Polk*, 2005 WL 1862126, at *7). In the at-issue homeowner insurance policy, the insurer Lightning Rod "agreed to insure against direct loss to property 'only if that loss is a **physical loss** to property.'" *Id.* at 40 (emphasis added). The court then went on to construe the "plain and ordinary meaning" of the term "physical injury":

> The term "physical injury" is undefined by the policy, so we give that term its usual meaning. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108, 652 N.E.2d 684. Read in context with the other terms used in the definition of "property damage," we construe the term "physical injury" to mean a harm to the property that adversely affects the structural integrity of the house. This interpretation is consistent with authorities on insurance law. *See, e.g.,* 10A Couch on Insurance (3d Ed.1998), Section 148:46 ("**The requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal, and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property**"); *Comment, Why Fear the Fungus: Why Toxic Mold Is and Is Not the Next Big Toxic Tort* (2004), 52 Buff. L. Rev. 257, 276 (homeowners must show "distinct and demonstrable" damage to property as a result of mold growth, such as "clear physical damage to the structure of the home" to recover under a homeowner policy).

*Id.* at 41 (emphasis added). According to the *Mastellone* court, the plaintiffs failed to establish that their house suffered a "direct physical injury" because the staining mold "did not alter or otherwise affect the structural integrity of the siding." *Id.* at 42.

The Sixth Circuit cited *Mastellone* with approval in *Universal Image Prods., Inc. v. Federal Ins. Co.*, 475 Fed. App'x 569, 573 (6th Cir. 2012). The Sixth Circuit noted that, while Michigan case law offered little "insight into the meaning of the phrase 'direct physical loss or damage,'" the Michigan Court of Appeals indicated that it may interpret "direct physical loss" to require tangible loss. *Id.* (citing *Acorn Investment Co. v. Michigan Basic Property Insurance Ass'n*, No. 284234, 2009 WL 2952677, at *1 (Mich. Ct. App. Sept. 15, 2009)). If Michigan indeed interpreted "direct

23

physical loss" to require tangible loss, then coverage must be denied. *Id.* Citing *Mastellone*'s definition of physical injury, the Sixth Circuit noted that the insured did not experience "tangible, physical losses, but economic losses" because the insured's landlord paid to remediate the insured's mold contamination and "not a single piece of Universal's **physical property** was **lost or damaged** as a result of mold or bacterial contamination." *Id.* at 573 (emphasis added).  The Sixth Circuit concluded that, while the insured demonstrated that it suffered significant inconvenience from the persistent odor, it did not also suffer **tangible** damage. *Id.* at 575 (noting that, "[m]ore importantly, no insured property was damaged or replaced as a result of odor")(emphasis added).

E.P. attempts to distinguish *Mastellone* on several bases, including that *Mastellone* was not decided on a Motion to Dismiss, the at-issue policy is a homeowner insurance policy instead of a commercial business interruption policy, there were claims for interior and exterior mold, and the opinion did not set forth all of the key terms and provisions of the at-issue policy.  (Doc. No. 20, PageID# 474-76.)  The Court is not persuaded by E.P.'s attempts to distinguish *Mastellone* here.  As Westfield points out in its Reply, the Court need only consider the legal principle announced in *Mastellone*.  (Doc. No. 21, PageID# 499.)  *Mastellone* demonstrates that Ohio courts, when construing the term "physical injury" within an insurance policy, look to whether the insured has suffered harm from a physical force that altered or tangibly affected the property. *Mastellone*, 175 Ohio App. 3d at 40.  Here, E.P. does not allege that any physical force acted upon, altered, or otherwise tangibly affected its property in any way.  Indeed, E.P. does not allege anything that could be remotely considered "physical injury" as construed in *Mastellone*.  Instead, E.P. alleges that "COVID-19's actual or suspected physical presence at or in the vicinity of Plaintiff's Properties prevents Plaintiff from making full use of the Property, especially in cases where the businesses

24

renting from Plaintiff must close in part or in full.  Under the terms and conditions of the Policy, **this kind of loss constitutes a physical loss to the Property in that there has been a loss of use and/or utilization of the Property**."  (Doc. No. 1-1, ¶ 12, emphasis added.)  E.P. does not plead the existence of any physical force that destroyed, compromised, or injured its property.  E.P. only pleads that COVID-19's "actual or suspected physical presence at or in the vicinity of" E.P.'s properties prevented E.P. from utilizing its property.  (*Id.*)  Under *Mastellone*'s persuasive authority, E.P. does not plausibly allege losses sufficient to trigger coverage under the Business Income (and Extra Expense) Coverage Form.

Following the close of briefing, E.P. and Westfield submitted various supplemental authorities, including three cases from within this District: *Santo's* (Doc. No. 23), *Henderson Road Restaurant Systems, Inc. v. Zurich American Ins. Co.* (Doc. No. 25), and *MIKMAR* (Doc. No. 32.) Each of these arose under Ohio law and each interprets the meaning of the policy language "direct physical loss of or damage to" in COVID-19 coverage cases.  As discussed above, *Santo's* and *MIKMAR* reach the same conclusion: that the plain and ordinary meaning of "direct physical loss of or damage to" unambiguously contemplates that only tangible, material alteration of insured property triggers coverage.  *See Santo's Italian Café LLC*, 2020 WL 7490095, at *8-9; *MIKMAR, Inc.,* 2021 WL 615304, at *6-8.

*Henderson Road*, on the other hand, reaches a different conclusion.  In *Henderson Road*, the court granted summary judgment to the insureds, a group of restauranteurs, who brought breach of contract and declaratory judgment claims against an insurer following its denial of COVID-19-related insurance claims.  *Henderson Road Restaurant Systems, Inc. v. Zurich American Ins. co.*, No. 1:20-cv-1239, 2021 WL 168422, at *1-2 (N.D. Ohio Jan. 21, 2021).  Unlike in *Santo's* and *MIKMAR*, the

*Henderson Road* court concluded that the policy language "direct physical loss of or damage to 'real property'" was ambiguous.  *Id.* at *10.  The court concluded that the language was susceptible to the plaintiffs' interpretation that plaintiffs "lost their real property when the state governments ordered that the properties could no longer be used for their intended purposes—as dine-in restaurants."  *Id.*  Accordingly, the *Henderson Road* court applied Ohio law and construed the ambiguous language against the insurer.  *Id.* at *12.  However, the Court respectfully disagrees with the *Henderson Road* court's determination that the policy language "direct physical loss of or damage to" is ambiguous.  As discussed at great length above, when read together, the plain, ordinary meanings of "direct," "physical," "loss," and "damage" clearly indicate that coverage is triggered when an insured property experiences some kind of tangible, material destruction or deprivation in full, or tangible, material harm in part.  Moreover, this Court's (and the *MIKMAR* court's) reading of "direct physical loss of or damage to" comports with the "period of restoration" language, which emphasizes the tangible, physical character of restoration following a Covered Cause of Loss.  Further, the Court observes that *Henderson Road* recognized there was "substantial ground for difference of opinion" with respect to its conclusion that the phrase "direct physical loss of or damage to" was ambiguous and certified the legal issue in the plaintiffs' breach of contract claim for interlocutory appeal.  *Id.* at *17.

An Ohio trial court recently relied on *Henderson Road* to conclude that the phrase "direct physical loss of or damage to" was ambiguous.  *McKinley Dev. Leasing Co. v. Westfield Ins. Co.*, Stark C.P. No. 2020 CV 00815 (Feb. 9, 2021) (Doc. No. 30, PageID# 823.)  The *McKinley* court concluded that both sides provided reasonable interpretations of the policy and that, as a result, the policy was ambiguous.  (Doc. No. 30, PageID# 828.)  However, while the Court acknowledges that the *McKinley* court also interpreted Ohio law—including *Mastellone*—the Court disagrees with the

26

*McKinley* court's conclusion that the policy was ambiguous.  Under Ohio law, a phrase is not ambiguous simply "because the parties disagree over its meaning or offer reasonable, competing interpretations."  *MIKMAR*, *Inc.,* 2021 WL 615304, at *11 (citing *Tattletale Portable Alarm Sys.*, 2016 WL 5122545, at *6 (S.D. Ohio Sep. 21, 2016) (citing *Shifrin*, 597 N.E.2d at 501)).  The *McKinley* court's decision, issued by an Ohio trial court and interpreting Ohio law, is "not binding precedent" on this Court but "'the opinions of the Court of Common Pleas have weight to the extent that their reasoning and conclusions are persuasive.'"  *Royal Ins. Co. of America v. Boston Beer Co.*, No. 1:04-cv-2295, 2007 WL 1072166, at *5 (N.D. Ohio Apr. 5, 2007) (quoting *Wolf v. Gardner*, 386 F.2d 295, 297 (6th Cir. 1967)); *see also Bailey*, 770 F.2d at 604 ("The decisional law of . . . Ohio trial courts . . . [is] accorded weight, although a federal court is not bound by lower court determinations if convinced by other data that the state's highest court would determine otherwise.") (internal citations omitted).  The Court finds that *McKinley* is not persuasive here because a contractual term is not ambiguous under Ohio law simply because two parties offer competing interpretations of the term.[2]  *See also MIKMAR*, 2021 WL 615304, at *11 (concluding same).  Moreover, for the reasons discussed above, to the extent that *McKinley* relies on *Henderson Road* to support its conclusion that the policy language is ambiguous, the Court respectfully declines to follow *Henderson Road*.

In its Third Supplemental Authority, E.P. identified another ruling from a different Ohio trial court, in which the court denied the insurer's motion to dismiss. (Doc. Nos. 27, 27-1.)  In *Queens*

---

[2] The Court observes that in *Brunswick Panini's* (which also applied Ohio law), the plaintiffs also submitted *McKinley* as a supplemental authority in support of its own argument that the phrase "direct physical loss of or damage to" was ambiguous.  *See* Plaintiffs' Notice of Additional Supplemental Authority at PageID# 2126, *Brunswick Panini's v. Zurich Am. Ins. Co.*, No. 20-cv-1895, 2021 WL 663675 (Feb. 19, 2021).  The Court presumes that the *Brunswick Panini's* court, after considering the Plaintiffs' Notice of Additional Supplemental Authority, rejected *McKinley*'s reasoning because the *Brunswick Panini's* court concludes that the phrase "direct physical loss of or damage to" is *not* ambiguous.  *Brunswick Panini's*, 2021 WL 663675, at *7-8.

*Tower Restaurant, Inc. v. Cincinnati Fin. Corp.*, an insurer denied the insured's COVID-19-related

coverage claim.  *Queens Tower Restaurant Inc. v. Cincinnati Financial Corp.*, Hamilton C.P. No. A

2001747 (Jan. 7, 2021).  The insured brought a claim against the insurer for coverage and the insurer

moved to dismiss.  *Id.*  The trial court denied the insurer's motion to dismiss.  *Id.*  The trial court's

analysis of the motion to dismiss, in its entirety, reads as follows:

> This Court finds that whether Covid-19 and/or Ohio's orders caused property damage
> is a question of fact.  As such, a reasonable jury could find that Primavista was entitled
> to coverage.  Accordingly, Cincinnati Insurance's Motion to Dismiss is Denied.

*Id.*  However, an "insurance policy is a contract whose interpretation is a matter of law."  *Sharonville*

*v. Am. Emps. Ins. Co.*, 109 Ohio St. 3d 186, 187, 846 N.E.2d 833, 836 (2006) (citing *Alexander v.*

*Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146, paragraph one of the syllabus (1978)).

The Court concludes that this Ohio trial court's very limited analysis does not constitute persuasive

authority upon which this Court can or should rely.  *MIKMAR*, 2021 WL 615304, at *7 (concluding

same).

Similarly, *Sylvester & Sylvester, Inc. v. State Auto. Mut. Ins. Co.*, Stark C.P. No. 2020 CV

00817 (Jan. 7, 2021), also adds little to the instant matter.  (Doc. No. 30, PageID# 834.)  In that case,

the Stark County Court of Common Pleas denied the insurer's motion for judgment on the pleadings

based on the existence and language of a food-borne illness endorsement, which modified the policy's

business income and extra expense coverage.  (*Id.* at PageID# 840-42.)  No such endorsement exists

in the instant Policy.

Finally, both E.P. and Westfield cite dozens of cases from outside Ohio to support their

respective arguments.  For example, in its Opposition, E.P. cites 14 cases from outside Ohio that it

contends do not require structural alteration of the insured property to trigger coverage for "direct

physical loss of or damage to" insured property.[3]  (Doc. No. 20, PageID# 471-73.)  In its Reply brief, Westfield identifies more than "20 dispositive rulings in favor of insurance carriers" issued between the time it filed its initial Motion and Reply that held that COVID-19 losses do not constitute covered "direct physical losses."  (Doc. No. 21, PageID# 493.)  In Westfield's Second through Sixth Supplemental Authorities, it identifies 81 COVID-19 coverage cases in which courts ruled in favor of insurance carriers.  (Doc. Nos. 22, 23, 28, 29, 32.)  Of those 81 cases, two cases—*Santo's*, discussed *supra*, and *Eye Specialists of Delaware v. Harleysville Worchester Ins. Co.*, discussed *infra*—applied Ohio law.[4]  (*See* Doc. Nos. 23, 28.)  In E.P.'s First through Fifth Supplemental

---

[3] E.P.'s examples stand generally for the proposition that, absent a physical alteration, physical loss may still occur when a property is uninhabitable, substantially unusable for its intended purpose, or deprived of all functionality.  Its examples include cases in which smoke infiltrated an outdoor theater, ammonia gases permeated the interior of a factory, gasoline odors infiltrated a church, and carbon monoxide infiltrated an apartment at dangerous levels.  (Doc. No. 20, PageID# 471-73.)  The Court notes that these cases are not especially persuasive because they hail from a variety of states and do not purport to interpret Ohio law.  These states' interpretations of "direct physical loss or damage" are broader than Ohio's definition of "physical injury" under *Mastellone*.  However, even under other states' more expansive definitions of "direct physical loss or damage," E.P.'s allegations likely remain insufficient to state a claim.  For example, E.P. cited *Port Authority of New York and New Jersey v. Affiliated FM Ins. Co.*, in which the Third Circuit held that the proper standard for "physical loss or damage" to a structure is that a property's "function is nearly eliminated or destroyed, or the structure is made useless or uninhabitable" as a result of some kind of contamination.  311 F.3d, 226, 236 (3rd Cir. 2002).  Not only does this not align with the narrower definition of "physical injury" in *Mastellone*, the Third Circuit's definition still requires some kind of physical "contamination" to "eliminate[] or destroy[]" the insured property's function.  *Id.*  Put simply, under this broader standard, E.P. must still allege that a *physical* force acted on its property to trigger coverage for "physical loss of or damage to" occur.  Moreover, in the COVID-19 context, district courts within the Third Circuit have applied *Port Authority* to conclude that "direct physical loss of or damage to" requires a "direct nexus between the alleged loss and the physical conditions of the covered premises."  *See, e.g., Frank Van's Auto Tag, LLC v. Selective Ins. Co. of the Southeast*, No. 20-2740 2021 WL 289547, at *5 (E.D. Pa. Jan. 28, 2021) (granting insurer's motion to dismiss insured's COVID-19-related claims); *see also Kahn v. Penn. Nat'l Mut. Cas. Ins. Co.*, No. 1:20-cv-781, 2021 WL 422607, at *6-7 (M.D. Pa. Feb. 8, 2021) (same).

[4] The Court notes that Westfield's contention that courts around the country have "overwhelmingly concluded that a policyholder's loss of income stemming from business closures and suspended operations during the COVID-19 pandemic does not constitute a covered 'direct physical loss'" appears to be accurate.  (*See* Doc. Nos. 21, 22, 23, 28.)  The Court also observes that other jurisdictions whose interpretations of state law may be similar to Ohio's (e.g., coverage for a "direct physical loss" is only triggered by tangible alteration to the structural integrity of the insured premises) have concluded that claims stemming from COVID-19-related business closures and suspended operations are not covered under "direct physical loss of or damage to" policy language.  *See, e.g., Rococo Steak, LLC v. Aspen Spec. Ins. Co.*, No. 8:20-cv-2481-VMC-SPF, 2021 WL 268478, at *4 (M.D. Fla. Jan. 27, 2021) (concluding that "there must be 'tangible damage to property for a 'direct physical loss' to exist" and, therefore, "Rococo must allege "actual, concrete damage" to its property to fall within the insurance policy") (citing *Prime Time Sports Grill, Inc. v. Dtw 1991 Underwriting Ltd.*, No. 8:20-cv-771-CEH-JSS, 2020 WL 7398646, at *6 (M.D. Fla. Dec. 17, 2020); *Infinity Exhibits, Inc. v. Certain Underwriters at Lloyd's London Known as Syndicate PEM 4000*, No. 8:20-cv-1605-JSM-AEP, 2020 WL 5791583, at *3 (M.D. Fla. Sept. 28, 2020)).  *See also Mama Jo's Inc. v. Sparta Ins. Co.*, 823 F. App'x 868, 879 (11th Cir. 2020).

Authorities, it identifies eight COVID-19 cases in which courts ruled in favor of insureds.  (Doc. Nos. 24, 25, 27, 30, 31.)  Of these eight, four cases—*Henderson Road*, *Queens Tower*, *McKinley Dev. Leas. Co.*, and *Sylvester and Sylvester, Inc.*, discussed *supra*—applied Ohio law.  (*See* Doc. Nos. 25, 27, 30.)  With the exception of these six cases (*Santo's*, *Eye Specialists*, *Henderson Road*, *Queens Tower*, *McKinley*, and *Sylvester*), none of the rest of these cases speak directly to the interpretation of the phrase "direct physical loss of or damage to" under Ohio law and have no impact on the Court's decision.

Threshold coverage under the Business Income (and Extra Expense) Coverage Form requires "direct physical loss of or damage to" insured property.  (Doc. No. 5-3, PageID# 118.)  The plain, ordinary meaning of "direct physical loss of or damage to" contemplates tangible, demonstrable alteration to the insured premises.  This reading is supported by persuasive Ohio appellate case law that the plaintiff-insured plead distinct, demonstrable, physical alteration of the insured property.  *See, e.g., Mastellone*, 175 Ohio App. 3d at 40.  Accepting the factual allegations in E.P.'s Complaint as true, E.P. fails to plead any physical alteration of its insured property.  Accordingly, E.P. fails to meet the threshold for coverage under the Business Income (and Extra Expense) Coverage Form.

### 3.    Civil Authority Coverage

In its Motion to Dismiss, Westfield argues that, under a plain reading of the Business Income (and Extra Expense) Coverage Form, E.P. is not entitled to Civil Authority coverage.  (Doc. No. 5-1, PageID# 69.)  Westfield further argues that E.P. cannot claim Civil Authority coverage because Ohio issued its Stay At Home Order to prevent the spread of COVID-19 rather than mitigate existing damage to another property within one mile of E.P.'s properties.  (*Id.* at PageID# 70.)  In its

Opposition, E.P. argues that it has "sufficiently alleged a physical loss of, including, but not limited to, loss of use[ ] of its premises and property due to the presence and physical characteristics of a physical substance (SARS-CoV-2), including the physical impact that substance had on Plaintiffs' property and property other than at Plaintiffs' premises (for purposes of Civil Authority coverage)." (Doc. No. 20, PageID# 471.)   On Reply, Westfield argues that E.P. has not alleged that a civil authority completely prohibited E.P. from accessing its own properties to repair or mitigate a Covered Cause of Loss at an adjacent property, such that it would trigger Civil Authority coverage under the Business Income (and Extra Expense) Coverage Form.  (Doc. No. 21, PageID# 502.)

The Court finds that E.P. is not entitled to Civil Authority coverage, based on the plain, ordinary meaning of the Policy language.  The Policy's Civil Authority provisions are located under "5. Additional Coverage" within the Business Income (and Extra Expense) Coverage Form.  (Doc. No. 5-3, PageID# 119.)  According to the Civil Authority provision, "[w]hen a **Covered Cause of Loss causes damage to property** other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises . . . ."  (*Id.*)  Two additional conditions must also apply to trigger Civil Authority coverage: (1) a civil authority must prohibit access to an area that immediately surrounds the damaged property and the insured's premises fall within that area, but are not more than one mile from the damaged property; and (2) the civil authority must have acted "in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage," or the civil authority acted in order to have "unimpeded access to the damaged property."  (*Id.*)  A "Covered Cause of Loss" means "**direct physical loss** unless the loss is excluded or limited in this policy."  (Id. at PageID# 165, emphasis

added.)  Therefore, the availability of Civil Authority coverage turns on the meaning of the undefined term "direct physical loss."  As discussed above, the plain, ordinary meaning of the term "direct physical loss" does not apply to the COVID-19-related economic losses that E.P. alleges in its Complaint.  Thus, E.P. is not entitled to Civil Authority coverage under the Business Income (and Extra Expense) Coverage Form.

Moreover, a plain reading of the Civil Authority provision confirms that E.P. cannot plausibly allege coverage under the provision.  E.P. fails to allege any damage to "property other than property at the described premises," within one mile of any of its own properties.  (*See* Doc. No. 5-3, PageID# 119.)  E.P. also fails to allege that an action of civil authority "prohibit[ed]," blocked, or prevented E.P. from accessing its premises.  (*Id.*)  In other words, while E.P. alleges that Ohio's Stay At Home Order prevented E.P. from making "full use of" its Property when its tenants were required to partially or completely close, the Stay At Home Order did not prevent E.P. from accessing its properties altogether.  (Doc. No. 1-1, ¶ 12.)  Accordingly, for the reasons above, the Court finds that E.P. fails to meet the threshold for Civil Authority coverage under the Business Income (and Extra Expense) Coverage Form.

### 4.    Virus Exclusion

Assuming *arguendo* that E.P.'s Complaint alleges plausible claims for coverage, the parties dispute whether such coverage nevertheless would be excluded by the Exclusion of Loss Due to Virus or Bacteria endorsement ("Virus Exclusion").  (*See* Doc. No. 5-3, PageID# 130.)  Westfield argues that the Virus Exclusion unambiguously bars coverage because it prohibits coverage for loss or damage "caused by or resulting from any virus . . . that induces or is capable of inducing physical distress, illness or disease."  (Doc. No. 5-1, PageID# 71.)  Westfield argues that E.P.'s attempt to

attribute its losses to Ohio's Stay At Home Order, rather than COVID-19 itself, is unavailing because the Stay At Home Order was issued to prevent the spread of COVID-19, a virus.  (*Id.* at PageID# 72.) Further, Westfield argues that E.P. "purports to manufacture an artificial distinction between losses resulting from a virus or disease and losses 'related to a pandemic.'"  (*Id.*)  Westfield argues that the Virus Exclusion is indeed applicable to a pandemic because a pandemic is merely widespread transmission of a virus.  (*Id.*)

E.P. argues that the Virus Exclusion is ambiguous because the exclusion presumes only one cause of loss, the existence of a "virus."  (Doc. No. 20, PageID# 467.)  However, E.P. contends that in the instant matter, there is more than a single cause of loss.  (*Id.*)  E.P. argues that the government closure orders resulted in loss and/or damage and such loss is not subject to the Virus Exclusion.  (*Id.*) Moreover, E.P. argues that because the Virus Exclusion does not contain an anti-concurrent causation clause, it "cannot be used to exclude coverage due to the governmentally mandated shutdowns."  (*Id.* at PageID# 468.)  Finally, E.P. argues that the "exclusion applies only to the extent that there was a commensurate 'physical distress, illness, or disease'" and that here, "there is no such result, nor did Equity plead that any 'physical distress, illness, or disease' affected its properties."  (*Id.*)  Therefore, according to E.P., its business disruptions are "far removed from any actual infection, which the virus exclusion was and is intended to address."  (*Id.*)

On Reply, Westfield argues that E.P. "ignores a litany" of recent decisions in which courts have held that virus exclusions preclude business income and civil authority coverage for COVID-19-related losses.  (Doc. No. 21, PageID# 504.)  According to Westfield, the Central District of California "recently rejected a similar argument in a case involving an identical virus exclusion that also lacked a traditional anti-concurrent causation clause . . . ."  (*Id.* at PageID# 505.)  Westfield also

argues that E.P. attempts to "have it both ways" by arguing that the Virus Exclusion does not apply because the Stay At Home Orders caused E.P.'s losses, but arguing elsewhere that it suffered direct physical loss due to the probable existence of COVID-19 particles on its premises.  (*Id.*)  Westfield also argues that E.P. misrepresents the Virus Exclusion language by attempting to read the words "or is capable of inducing" out of the Virus Exclusion.  (*Id.* at PageID# 506.)  Finally, Westfield argues that E.P. attempts to impermissibly rewrite the Virus Exclusion by inserting a "geographic limitation" in its attempt to distinguish between a "virus" and a "pandemic."  (*Id.* at PageID# 507.)

The Court finds that the Virus Exclusion unambiguously excludes coverage for E.P.'s alleged COVID-19-related losses.  The Court begins its analysis by examining the plain language of the Virus Exclusion: "B. We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." (Doc. No. 5-3, PageID# 130.)  The Court concludes that, on its face, this provision excludes coverage for E.P.'s alleged losses.  Unquestionably, COVID-19 is a virus capable of inducing physical distress, illness, or disease.

E.P.'s various Virus Exclusion arguments are not persuasive.  First, E.P.'s argument that the operative cause of loss in the instant matter was Ohio's Stay At Home Order, rather than the COVID-19 virus, is unavailing.  In its Complaint, E.P. alleges that, "[b]ased on the prevalence of the virus in Cuyahoga County and throughout Ohio, it is probable that Equity sustained direct physical loss of or damage to its properties **due to the presence of coronavirus**, and **has unquestionably sustained direct physical loss as the result of the pandemic** and/or civil authority orders issued by the Governor of Ohio."  (Doc. No. 1-1, ¶ 29, emphasis added.)

Further, the Court notes that an Ohio trial court recently concluded that an identical Virus Exclusion clause was not ambiguous. In *Eye Specialists of Del. V. Harleysville Worchester Ins. Co., et al.*, the Franklin County Court of Common Pleas interpreted the following Virus Exclusion clause:

> A. The exclusion set forth in Paragraph B. applies to all coverage under Section I - Property in all forms and endorsements that comprise this Businessowners Policy, except as provided in Paragraph C. This includes but is not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

> B. We will not pay for loss or damage caused by or resulting from any virus, bacterium or other micro-organism that induces or is capable of inducing physical distress, illness or disease.

(*Eye Specialists of Del. V. Harleysville Worchester Ins. Co., et al.*, Franklin C.P. No. 20-cv-6386 (Feb. 1, 2021), Doc. No. 28-1, PageID# 807.) Like the instant Virus Exclusion, the *Eye Specialists* virus exclusion also did not include an anti-concurrent causation clause.

The *Eye Specialists* court rejected the plaintiff's arguments that a "pandemic" differed from a "virus," and concluded that COVID-19, not a governmental order, caused the plaintiff's business interruptions. (*Id.* at PageID# 807-08.) Accordingly, the trial court concluded that, as a matter of Ohio law, the virus exclusion was not ambiguous because "COVID[-]19 is capable of inducing physical distress, illness or disease." (*Id.* at PageID# 810.) The trial court concluded that "[l]osses resulting from COVID[-]19, a virus, are not covered because they are excluded by the virus exclusion." (*Id.*) The Court is persuaded by the *Eye Specialists* court's straightforward reasoning. The instant Virus Exclusion bars coverage in this matter.

E.P.'s argument that the exclusion only applies "to the extent that there was a commensurate 'physical distress, illness, or disease'" also fails. (Doc. No. 20, PageID# 468.) E.P. ignores entirely the language that the Virus Exclusion applies where a virus "is capable" of producing such adverse

health effects.  (Doc. No. 5-3, PageID# 130.)  The Virus Exclusion does not depend on the actual onset of symptoms or illness.

Finally, E.P.'s argument that the Virus Exclusion is inapplicable when the alleged cause of loss is a "100-year pandemic" is unavailing.  Merriam-Webster defines a "pandemic" as "an outbreak of a disease that occurs over a wide geographic area (such as multiple countries or continents) and typically affects a significant proportion of the population**:** a pandemic outbreak of a disease . . . ." *Pandemic*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/pandemic (last visited Feb. 22, 2021).  To refer to COVID-19 as a "pandemic" is to refer to the worldwide outbreak and spread of the disease caused by the COVID-19 *virus*.  By the Virus Exclusion's own terms, claims for loss or damage resulting from viruses are excluded.  Accordingly, the Court concludes that Westfield demonstrated that the Virus Exclusion applies to bar coverage in the instant matter.  The Court further concludes that the language is plain and unambiguous.

### 5.    Breach of Covenant of Good Faith and Fair Dealing

In its Motion to Dismiss, Westfield argues that E.P.'s Count III claim, for breach of the covenant of good faith and fair dealing, fails as a matter of law because E.P. is not entitled to coverage as a matter of law and, therefore, Westfield's denial of coverage was per se reasonable.  (Doc. No. 5-1, PageID# 73.)  E.P. did not respond to Westfield's argument that Westfield's coverage position was per se reasonable.  As discussed above, the Policy does not provide coverage for E.P.'s claimed losses.  Thus, Westfield's denial of coverage was reasonable and E.P.'s bad faith claim must be dismissed.  *See Cleveland Freightliner, Inc.* v. *Federated Serv. Ins. Co.,* No. 1:09-cv-1108, 2010 WL 395626, at *13 (N.D. Ohio Jan. 26, 2010) ("Ohio law clearly states if denial of coverage is appropriate

there is no bad faith.") (citing *Hahn's Elec. Co. v. Cochran*, 2002 WL 31111850, at *8 (Ohio 10th Dist. Ct. App. 2002)).

**6.** **Westfield's Alternative Motion to Strike Class Allegations**

As an alternative to its Motion to Dismiss, Westfield also moved to strike E.P.'s class allegations.  Because the Court dismisses E.P.'s Complaint in its entirety, Westfield's Alternative Motion to Strike Class Allegations is denied as moot.

## III.  Conclusion

The Court finds that E.P. fails to plausibly allege claims that meet the threshold to trigger coverage under the Policy.  Accordingly, for the reasons set forth above, Westfield's Motion to Dismiss (Doc. No. 5) is GRANTED.  Westfield's Motion to Strike Class Allegations (Doc. No. 5) is DENIED as moot.

**IT IS SO ORDERED.**


 *s/Pamela A. Barker*
PAMELA A. BARKER
Date:  February 26, 2021                         U. S. DISTRICT JUDGE